[No. 1891.]

*Ex Parte* NEIL BOYETT.

CONSTITUTIONAL LAW — RIGHT OF BAIL — FACT CASE.— Under a proper construction of the eleventh section of the Bill of Rights, which provides that " All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident," the proof, in order to authorize the refusal of bail, must show clearly and conclusively that the accused, acting either alone or in concert with others, committed the capital offense charged. See the opinion for a definition of the term " evident," as used in this connection ; and see the statement of the case for evidence in a *habeas corpus* proceeding for bail under an indictment for murder, *held* insufficient to authorize the refusal of bail, inasmuch as it is not "proof evident" of the appellant's complicity in the offense charged.

*Habeas Corpus* on appeal from the District Court of Nolan. Tried below before the Hon. William Kennedy.

The indictment under which the writ of *habeas corpus* in this case was sued out was filed in the district court of Nolan county, Texas, at its June term, 1885. It charged the applicant with the murder of Ben Warren, by shooting him with a gun, in Nolan county, Texas, on the 10th day of February, 1885. Upon the hearing of the writ, which was had at the same term of court, the applicant was remanded to the custody of the sheriff without bail; and this appeal is prosecuted from that judgment. Deceased was shot about 10 o'clock in the night, while he was sitting in the office of a hotel at Sweetwater.

P. W. Thompson was the first witness introduced by the appli-
cant. He testified that for eight months prior to this trial he had
lived on his present place at the head waters of Yellow Wolf Creek,
about four miles distant from Colorado City. His acquaintance
with the applicant extended back over the four years next preceding
this trial. He had known the deceased by sight since March, 1884,
and for about the same length of time he had slightly known one
George Sutton. Witness, while herding his sheep, some four or five
miles distant from Yellow Wolf Creek, on or about February 5,
1885, met the said Sutton, who asked him if he, witness, was going
to Sweetwater on that day. Witness replied that he was not, as he
could not then leave his sheep. He then asked Sutton if he was
going to Sweetwater, and upon his replying in the affirmative, wit-
ness asked him if he was not afraid to go. He replied: "No; I am
going there to see if Warren is there; and if he is, either he or I
will have to haul away." Sutton did not say, at that interview,
which of the Warrens he alluded to, nor did he make other remarks
about any Warren. The witness had several talks with Sutton
after the latter got out of the Coleman jail and returned to Fish
Creek. In one of these conversations Sutton said that he did not
want to hurt Ben Warren, but that Warren must not threaten his
life, as, according to his information, he had done. This conversa-
tion last referred to, occurred, to the best of witness's recollection,
in April, 1884. Witness had never heard Sutton otherwise threaten
Ben Warren.

Cross-examined, the witness stated that he first formed the ac-
quaintance of Ben Warren on Fish Creek in Nolan county, on or
about March 25, 1884, at which time he, witness, lived about four
miles above Colorado City. Witness was not related to Wood, who
in another indictment is charged with this same murder, but sus-
tained friendly relations with him. The applicant is a brother-in-
law to the witness. The witness had never told the applicant of
his conversation with Sutton on Yellow Wolf Creek; in fact, he had
seen the applicant but once or twice since then, and only long
enough to shake hands and exchange greetings. Witness could not
recollect to whom he first told of his conversation with Sutton.
No one but witness and Sutton were present at that conversation,
and they were then on the range, at least two and a half miles dis-
tant from the nearest habitation. Witness had not seen Sutton
since that conversation. He did not know where Sutton then lived,
nor from whence, except a south direction, he came to witness. If
he had any business with witness, he did not make it known. When

he left witness, he went towards Sweetwater, saying that he was going to that town. Sutton on that occasion rode a bay horse, but witness could not now describe his dress. The interview between witness and Sutton lasted but a very few minutes. No particular feeling of friendship existed between them.

The witness was unable to testify as to the personal relations which existed between the applicant and the deceased. He was unable to say whether those relations were friendly or otherwise. He remembered that he had one particular conversation with the applicant, but could remember only some of the applicant's statements then made. This conversation occurred in November of 1884, while the two, witness and applicant, were *en route* to the Runnels county court, both being under bond upon a charge of fence cutting. Applicant, in the course of that conversation, said that he hoped Ben Warren would not be bothered, but that he expected he would be. Witness could not remember that any one was then immediately present except himself and applicant, though several were in the party going to Runnels county. The party had stopped at noon when the remark was made by applicant, and the various other members of the party were standing about "promiscuously." The witness could not say which of them was nearest to himself and the applicant. He paid but little attention to the distances between the various persons, and was unable to say whether or not any person other than himself heard the applicant's remark. Witness could not recall that any conversation of importance transpired between himself and applicant on that trip. He knew nothing of a meeting on Valley Creek to arrange to employ counsel to defend the fence-cutting cases in the Runnels county court. Witness had no love for the deceased. The camping place at which the conversation between witness and applicant occurred was inside of Odom's pasture, and about a mile distant from Valley Creek. Witness had never heard either the applicant or Wood, the other defendant, make an unkind remark about the deceased.

M. D. Boyett, a brother to the applicant, was his next witness. He testified that he resided on Fish Creek, in Nolan county, where he had lived for some six or eight years. He knew Ben Warren, the deceased, by sight, and last saw him in life on the evening he was killed. Witness was in the town of Sweetwater on the day and night of the killing and the day after the killing. Witness learned of the killing while he was in the saloon of one Johnson, in the town of Sweetwater. He had been in that saloon some ten or fifteen minutes, having come direct from Bennett's saloon, when a

man, whom he did not know, rushed into the saloon and said: "A man has been shot down yonder."

The Central Hotel in Sweetwater stands south of Johnson's saloon, in the direction of the railroad. It stands northwest from Bennett's saloon, and must be passed by a person going from one saloon to the other. McCausland and McDonald were the only parties witness remembered to have seen in Bennett's saloon when he, witness, left that saloon to go to Johnson's, but just prior to his departure, he (witness), applicant, Jim Durham, Bud Wood and Mc-Causland were together in the saloon of Bennett, the parties named, except McCausland, throwing dice for whisky. Just prior to the departure of the witness, the applicant and Bud Wood went out to the south platform, which leads from the saloon to the depot. Witness shortly left the saloon, going out of a door other than that through which applicant and Wood went out. He encountered McDonald near Bennett's saloon, and stopped and talked with him two or three minutes, and went then to Johnson's saloon. Passing the Central Hotel, *en route* to Johnson's saloon, the witness saw a man, leading a horse, go into the alley between the hotel and a livery-stable. The man was just at the corner of a buggy house, passing around several vehicles, and going in a westerly direction, and was about ten yards from the mouth of the alley when the witness last saw him. Witness could not recognize that party in the dark. Witness could not remember what was said by the applicant and his companions when they left Bennett's saloon, except that Wood proposed to go to bed as he was sick; nor did he know where they were going. Prior to that time they said that they were going to sleep either at Eidson's, Beall's, Hunt's or the opera house,—they did not then know which. A case against the witness for carrying a pistol was for trial. Wood was a witness against this witness, and, when the case was called, Wood failed to appear. Witness then hunted and found him, looking sick, and was told by him that he was sick and had been throwing up all day.

Cross-examined, the witness stated that he was not related to the defendant Wood, but was his intimate friend and neighbor, living within three-fourths of a mile of him. Witness could not remember whether or not Jim Durham had left Bennett's saloon when he left and met McDonald, but it was his impression that he had. Witness could not remember what he was doing when the man rushed into Johnson's saloon with the news of the shooting, but he was either sitting at the stove or standing about the billiard table. In reply to the man he said nothing that he could recall. Witness

went immediately to the place of the shooting, ignorant of who was shot until he reached the body. Before reaching the body he heard some one tell Fred Beall that the man who was shot was the man who had that day been on trial for shooting a cow. The shooting of the deceased was a very great surprise to the witness. Witness knew nothing of the state of feeling which then existed between the applicant and the deceased, or between Bud Wood and the deceased. He had never heard either applicant or Wood speak of their feelings for Warren, and had no reason to suppose that either had hard feelings towards the others. He had seen Wood and the deceased conversing in the town of Sweetwater, but did not know the substance or subject-matter of their conversations. He had heard the applicant speak of Warren since his death, but could not recall what he said.

Witness was present at a meeting on Valley Creek, held by the several parties charged with fence cutting. It was for the purpose of arranging to employ an attorney to defend the cases. This meeting, which was held in the summer of 1884, was attended by witness, applicant and their father, and also W. and T. Franks, Bill and Lem Thompson, W. Darby, F. and W. Dougherty, B. Bardwell, Bud Woods, W. P. Cooksey, Bremer, R. and S. Hylton, Porter and Keith; and, among others from Spring Creek, the Cooper boys and Pete Thompson, whose initials the witness believes to be W. P. Witness was then under bond for fence cutting in Runnels county. This meeting was had at a picnic. Witness denied that, on the morning after the shooting and on the streets of Sweetwater, he said to old men Wood and Boyett, " Old men, you have got to prove where Neil and Bud were last night when that shot was fired."

Ed. Lormey was the next witness for the appellant. He testified that, immediately after the shot which killed Warren was fired, he saw a man standing in the alley at the northeast corner of the Central Hotel. That man went, or started to go, west, out of the alley, whether on foot or horseback the witness could not say, as he did not see that man after he passed the center of the window of the dining-room. The witness did not and could not identify that man. Witness knew the applicant, and had seen him a few times before the shooting of Warren. The night on which the shooting occurred was a tolerably dark one. The witness saw the man in the alley, as related, from a distance of about twenty feet.

This witness was reintroduced at a subsequent stage of the proceedings, and testified as follows: " I was at the Central Hotel when Ben Warren was killed. I was in the room on the lower

floor in the southeast corner of the building, I sat there about a half minute after hearing the shot, and then went out on the gallery. When I stepped out of the room on the gallery, a man came running out of the hotel office with his overcoat on his arm. He stepped off the gallery, but I did not see which way he went. At the same time I saw this man running out of the office, I saw another standing near the corner of the hotel with a pistol in his hand, in the act of replacing it in the scabbard, or taking it out, I don't know which; and as the man ran out of the office, the man with the pistol ran down the alley between the hotel and stable fence, in a west direction. I then went into the office. Colonel Odom opened the dining-room, and said: 'I am afraid they will shoot me.' He, Odom, was then standing in the dining-room. I then walked into the dining-room, where Odom was. Odom asked: 'Where will I get?' I told him to get in some dark place. At that moment I looked through the dining-room window to the alley, and saw a man with a pistol as if in the act of shooting into the dining-room. I told Odom to squat down, and then went into the office. The man with the pistol walked off down the alley in a west direction. The man who came out of the office with the overcoat had not stepped off the gallery when I saw the man standing at the corner with the pistol. This occurred about bedtime on the night of February 10, 1885, in Sweetwater, in the county and State aforesaid."

Wilson Hunt was the next witness introduced by the applicant. He testified that he lived in a house situated about four hundred yards distant from the Central Hotel, in the town of Sweetwater. He went home just before dark on the night of the killing of Ben Warren, and did not go back to town until the next morning. A little before 10 o'clock on the night of the killing, a horse, at very near full speed, passed the house of witness going towards old man Waldrip's place. Witness did not see the horse, but distinctly heard the rattle of his feet, and, though he could not say that the horse carried a rider, it was his opinion, based upon long experience in the management of, and familiarity with, horses, that some one was on his back.

Cross-examined, the witness stated that he was a drayman in the employ of Mr. Hill. To the mind of the witness, a horse at full speed, carrying a rider, runs a great deal heavier and straighter than if he runs unladen. Messrs. Waldrip, Drouthitt and Barnett and Mrs. Drone live south or southeast of the witness, but witness had never known either of them to pass his house horseback at that

hour of the night, though they and the members of their families frequently did so in the day-time. There was a public road above, and another below, the witness's house, but none immediately in front of or behind the house. A path or horse passway ran just in front of witness's house. Old man Wood, old lady Wood, the witness's wife, and Jim Warren, were at the witness's house at the time. Witness had not gone to bed when the horse passed, but old man Wood had. Jim Warren was then asleep, or at least he afterwards, when the passage of the horse was spoken of, said that he was asleep. Jim Warren got up from bed, but witness could not say positively whether he did so before or after Bud Wood arrived at the house. Jim Warren participated in the conversation that ensued. The horse passed the witness's house a few minutes before 10 o'clock. Witness had been with Wood ever since that night, off and on. The witness and the applicant were good friends, but could not be called especial intimates.

James A. Durham, an employee in the hardware establishment of Dulaney Brothers, in Sweetwater, was next introduced by the applicant, and testified that he was in Dulaney's store when the fatal shot was fired. He heard the shot. It was fired a short time, witness could not say exactly how long, before 10 o'clock at night. Witness was able to locate the time as he did by the fact that Mr. Jeff Dulaney, leaving the store a few minutes after the shot was fired, remarked that it was then 10 o'clock.

L. F. Otey next testified, for the applicant, that he lived in Sweetwater, about two hundred and fifty yards distant from the Central Hotel. Witness was in the French restaurant, west of the Palace Hotel, until after 9 o'clock on the night of the assassination of Ben Warren. He heard no pistol shot while in that restaurant. He would certainly have heard the report if a pistol had been fired in the alley next to the Central Hotel while he was at the restaurant. From the restaurant the witness went home, arriving there some little time before 10. He had been in the house about five minutes when he heard the report of a pistol. He could not say that the shot he heard was the one that killed Ben Warren. The house was closely closed, and witness could not decide from which direction the report came. Witness's clock usually kept railroad time.

Cross-examined, the witness stated that he was unable to affirm, upon his own knowledge, that, on the night of the homicide, his clock was running on railroad time. The alley north of the Central Hotel is seventy feet distant from Johnson's saloon. Leaving the restaurant, the witness went north to the alley, thence through the

alley east to his home.   He did not see a horse hitched in the alley
as he went through it.   Mr. Bartelsti was with the witness at the
restaurant on that night.   Guinel, the proprietor of the restaurant,
his wife and brother were also in the restaurant while witness was
there.   There are no houses between the Central Hotel and the
room in the restaurant in which the witness and the parties named
were, just before witness went home.

W. C. Johnson, the proprietor of the saloon often referred to in
this trial, was the next witness for the applicant.   He testified that,
a few minutes after 9 o'clock, just as he was preparing to go home,
he was engaged in conversation by the applicant and old man
Boyett.   Bud Wood was not then present, though he may possibly
have been one of the large crowd that had congregated in the saloon.
At all events witness did not see him.   Applicant remarked to the
old man (Boyett) that he was going to leave there.   Old man Boyett
replied that he was, too.   Witness remarked that he, too, was going,
and left, going by the postoffice, and thence home.   It was now but
a few minutes after 9 o'clock by the saloon's time.   Witness did not
hear the Boyetts say where they were going to sleep.   Witness on
his arrival at home proceeded to read a newspaper he had received
that night, and, while thus engaged, heard the report of a pistol.
It was now near 10 o'clock, and perhaps three-quarters of an hour
since the witness left his saloon.   Witness heard but the one shot,
and retired about half-past 10 o'clock.

On his cross-examination the witness said that he heard the clock
strike ten just before or just after he heard the shot — he was not
positive which.

Deputy Sheriff H. H. Williams testified, for the applicant, that he
was in Johnson's saloon, playing pool, when the deceased was killed.
The fatal shot was fired at about ten minutes to 10 o'clock.   Of this
fact witness was certain, for he asked Mr. Beall the time, on hearing
the report, and Beall on looking at his watch said it was ten min-
utes before ten.   Presently a man ran into the saloon with the news
that a man had been shot at the Central Hotel.   Witness put on
his coat and looked at the clock as he started to the scene of the
shooting.   It was then 10 o'clock, and about ten minutes had elapsed
since he heard the report of the pistol.   Witness could not say how
Johnson's saloon clock compared with railroad time.

W. S. Lester testified that he was asleep in the office of the Cen-
tral Hotel when the fatal shot was fired.   A general stampede fol-
lowing the report, the witness got up.   In a short time some one
asked the hour, and some one else replied: " It is just a quarter to

ten." Lormey was the first man witness saw come into the office after the shooting, and Judge Boone the next. The remark about the time was made, the witness thought, after Judge Boone's arrival.

H. H. Williams, recalled, testified that on leaving Johnson's saloon he went to the Palace Hotel, and thence to the Central Hotel. Some two or three minutes had elapsed, when witness got to the Central Hotel, from the time he left Johnson's saloon. From the Central Hotel, where he remained about five minutes, witness went to the court-house to wake up Sheriff Bardwell, which trip occupied about one minute. About two minutes were exhausted in arousing Bardwell. Witness then went back to the Central Hotel, about ten or fifteen minutes having expired since he first left Johnson's saloon.

Sheriff Bardwell testified that he was asleep in one of the lower rooms of the court-house when Ben Warren was killed. H. H. Williams brought witness the news of the killing. It took the witness, he thought, about fifteen minutes to dress, after which he went to the Central Hotel. He had been in the hotel but a few minutes when he took occasion to consult his watch, which he regulated by railroad time, and found that it was then either two minutes before or two minutes after ten,— he could not remember which. Witness saw Wood, the other defendant charged in this case, about the court room, on the day after the homicide, and may have seen him several times, but did not hear him complain of being sick — in fact he had no conversation with him.

Cross-examined, the witness said that though he set his watch by the depot clock in the morning, he could not swear that it had railroad time to a minute, as watches frequently varied in the course of sixteen hours. In the opinion of the witness, the distance from the west door of the court-house to the Central Hotel was between one hundred and thirty and one hundred and fifty yards.

The following agreement appears in the record: "It is agreed by counsel for both the State and the defendant that the distance from Sweetwater to the head of Yellow Wolf Creek is about twenty-five or thirty miles; and it is further agreed that there was a light burning in the room of the Palace Hotel where A. W. Hilliard was sitting when he heard a shot on the night of February 10, 1885." Here the applicant rested.

James Bennett was the first witness for the State. He testified that he retired between five and fifteen minutes past 9 o'clock on the fatal night. He heard the report of a pistol, between fifteen and twenty minutes after he lay down. That shot was fired near

half-past 9 o'clock by the witness's time-piece, which he considers a very good watch.

J. H. Douthitt was the next witness for the State. He testified that he lived with his father about a mile south of Sweetwater. He frequently went to and from town on horseback, and frequently did so after night, and at night always rode in a lope to and from town. Two or three Hunts lived in the neighborhood, but witness did not know which of them was Wilson Hunt. Going to and from town, witness generally passed the house owned by old man Wood, on the branch. He did not positively know who occupied that house. Witness was in the town of Sweetwater on the night of the Warren homicide, and went home that night, but could not now remember whether he traveled horseback or not.

Colonel T. L. Odom was the next witness for the State. He testified that he took supper at the Central Hotel in Sweetwater, on the night of the tragedy, and remained about the hotel until about half-past 9 o'clock. He was in company with the deceased. The two, with other gentlemen, were sitting about the stove in the hotel office, talking, when the witness heard the sudden crack of a gunshot. Witness sprang from his chair and passed rapidly into the adjoining dining-room, thinking that he had been fired at. On turning in the dining-room and looking back into the office, he saw blood spurting from Warren's face. Witness called to some one to prevent the fall of Warren's body, and to summon a doctor. He then closed the dining-room door and remained a few minutes in the dark. About this time witness thought he saw the flash of a light on the window panes north of where he stood, and presently a gentleman entered the dining-room from an adjoining room. Witness told him that Ben Warren had been shot in the office. After a few minutes witness passed out of the dining-room through the kitchen, and went to the Palace Hotel, where he secured quarters and retired for the night.

Witness saw the dead body of Warren next morning in the office of the Central Hotel. The ball passed into the head just below the right ear. It entered the room from the west side of the third window on the north side, counting from the northeast corner of the building. The stove sat about ten feet from the window through which the ball entered the room, and was across the room from that window at an angle of about fifty or sixty degrees towards the front of the building. Witness sat about three feet south of the stove, and nearly on a line between the front and dining-room doors. He was, when the shot was fired, in the act of punching

the fire, with his head inclined slightly forwards. Warren, the deceased, was sitting about four feet to the right of witness, between him and the front door of the office. He was sitting upright, smoking his pipe.

The witness examined the bullet hole in the window and the surroundings, early next morning. His statement of distances and measurements are only careful estimates. A plank fence, about three and a half feet high, runs around the Central Hotel building on the north side, about three feet from the wall of the building. The ball entered the west side of the window from the outside, about one inch from the casing that frames the glass-pane, and about five feet from the ground. The witness carefully examined the ground about the outside of the fence, and found the track of a man, the toe of the right foot showing very plainly against the bottom plank of the fence. This track was about northwest from the window, and if the man who made it was then standing erect, it would place him behind the wall west of the window. Witness had handled fire-arms since he was ten years old. In discharging guns he always fired from his left shoulder. It was his opinion that if shot from the track described, the fatal ball must have been fired by some one shooting from the left shoulder. The hotel office in which the deceased was killed is a room about eighteen feet square. The ball entered at the northwest window of the room, about five feet above the ground level, and passed into the south wall of the room about three feet above the floor, and near the southeast corner of the room. Two lamps were burning in the office when the fatal shot was fired, but the dining-room was dark. It was the understanding of the witness that a very unkind state of feeling had existed between the applicant and the deceased since about June, 1884.

On his cross-examination the witness stated that ill feeling existed between the deceased and ten or a dozen other parties besides the applicant, but he did not think that the ill feeling as between the deceased and the others was as violent as that between the applicant and the deceased. However, he based this impression only upon what he knew of the troubles between them. Witness knew a man who was called George Sutton by some, and Baker by other parties. He did not know that the same state of feeling which existed between applicant and deceased existed between Sutton and deceased. Four of the parties between whom and deceased hard feelings existed were in Sweetwater on the night of the assassination. They were the applicant, Mc Boyett, Riley Hylton and W. J.

(Bud) Wood. Witness had no recollection of seeing applicant and deceased associating and drinking together since their trouble in June, 1884.

A. W. Hilliard was the next witness for the State. He testified that he went to Mrs. Harvey's sitting-room in the rear of the Palace Hotel, after supper on the night of the assassination, and remained there an hour and a half or two hours. The Palace and the Central hotels are on the same block, the Palace occupying a corner lot and facing the depot. The Central Hotel faces east. Several buildings stand between the two hotels. Witness heard the report of a rifle while in Mrs. Harvey's sitting-room, but could not designate the hour at which it was fired. It was the clear, distinct report of a rifle, and not the roaring noise of a pistol-shot. It was the only shot he heard that night. The door being closed, the witness could not locate the direction from which the gun was discharged, though he could easily determine that it was fired at a point not far distant from the Palace Hotel. Ladies only were in the room with witness when the shot was fired. Immediately after the shot was fired, the north door of the hotel, leading into the back yard (which was on the most direct route from the Palace Hotel to the rear of the Central Hotel), was opened, and witness heard the noise of persons running. The noise grew more distinct as the door closed. The noise appeared to be made by persons running towards the room in which the witness was, from the north, in which direction the Central Hotel was located. Witness did not hear anything more of the parties running after they passed the Palace Hotel. The witness could not say at what distance the parties running passed the room in which he then was.

Cross-examined, the witness stated that it was his impression that there was an alley back of Mrs. Harvey's room and in the rear of the Palace Hotel, which alley, he thought, was fenced at the south end. There was no obstruction between the Central Hotel and Mrs. Harvey's room, by the back way, except a very low fence. Witness could not say positively from which direction the footsteps referred to came, nor which way they went. Mrs. Harvey's room was on the west side of the Palace Hotel. West of that was an alley. The French restaurant stood across the alley from the room described. Witness knew nothing of a fence connecting the French restaurant and the livery-stable. The livery-stable stood on another block than the one on which the two hotels were situated. There was an opening called an alley, running east and west between the livery-stable and the Central Hotel. Going through the alley from

either the livery-stable or the Central Hotel, one would go west. Witness did not know that both hotels had inclosed back yards, lying in the same directions. It was easy to go from one hotel to the other by a back way. The livery-stable and yard stand north of the Central Hotel, and across the alley. When the witness first heard the noise of running, he thought it was made by horses, but concluded, as it came nearer, that it was made by men running. Witness did not hear the footsteps as they passed the hotel proper, and continued on. The footsteps the witness heard, just after the shooting, were not on the front street, but he was unable to locate them exactly. They came towards witness, according to their sound, from the north.

County Judge Germany, for the State, described the bullet holes in the window and south wall of the Central Hotel office substantially as did Colonel Odom.

J. H. Beall was the next witness for the State. He testified, without mentioning the hour, that the applicant and his co-defendant Wood were at his house on the night of the tragedy. When they went to take their leave, the witness went out with them to the gallery, closing the door behind them. Witness made some apologetic remark about not being able to offer them quarters for the night. They replied that it made no particle of difference, as they had not visited the witness with the purpose of remaining over night. The next remark made by either of the parties referred to the prevailing cold wind, and their next was an inquiry about the weather. Their next was an inquiry as to whether or not witness had heard any shooting that night. Witness replied that he had not. The applicant then spoke of the recent change of the Fish Creek road over the Bitter Creek divide. His next remark was that there had been some shots or a shot fired in town. It was the impression of the witness that Ben Warren, the deceased, was next spoken of. The applicant then said, in effect, that if he knew Ben Warren to be dead he would be willing to die and go to h——ll in three minutes. The witness could not repeat the exact words he used. During the latter part of this conversation the witness was standing on the porch, and the applicant and Wood were at the gate, some three or four feet distant from the porch. Applicant was standing nearer witness than Wood was. It was the recollection of the witness that Wood was a party to the conversation which followed the statement that a shot or shots had been fired in town. The distance from witness's office in town to his house is perhaps four hundred yards, and is usually walked by the witness within four or five minutes.

J. E. Warren, a brother to the deceased, was the next witness for the State.    He testified that he was at the residence of Wilson Hunt, near Sweetwater, until 12 o'clock on the night of the murder. After 12 o'clock he was at the Central Hotel.    He was not informed of his brother's death until 12 o'clock.    Witness lived about three hundred yards distant from the house of the defendant Wood.    He did not know the state of feeling existing between applicant and deceased, but had not seen them speak for some time.   When the applicant and Wood ascertained that the deceased was to be a witness against them in some prosecutions pending in Runnels county, the applicant proposed to witness to see the deceased and get him to leave the country.    He said to witness: "Jim, I don't want to kill him or see him hurt."    Witness first saw the defendant Wood on the morning after the killing, on the street in front of Bennett's saloon and near the restaurant.    The applicant, Mc Boyett and Riley Hylton were with him.    Witness, who was across the street, motioned, and Wood crossed the street and told witness that he had fed witness's horse.    On the night previous he proffered the witness any assistance he could render.

Cross-examined, the witness stated that he could not remember the date of his conversation with the applicant, referred to, further than that it occurred soon after he and Wood learned that deceased was to be a witness against them.    On the same day, though not at the same time, Wood told witness that Ben Warren was to testify against him and applicant, or had "given them away."    No third party was present at either of these conversations.    Several talks had been had since then between witness, applicant and Wood. The two conversations (one each with applicant and Wood) occurred on the day that the several defendants in fence-cutting cases had their meeting on Valley Creek, respecting the employment of counsel, which meeting was held in the spring or summer of 1884.    It was the impression of the witness that the defendant Wood's overcoat was at Wilson Hunt's house on the night of the killing.  Witness heard Wood complain of being somewhat sick on the day before, but not on the day of the assassination.    He may, possibly, on the day of the homicide, have told witness that but for his being unwell he would go to Fort Chadbourne for him, and would go, though not well, if witness could not employ any one else.

W. C. Keith, a brother-in-law to the defendant Wood, was the next witness for the State.    He testified, in substance, that the feelings entertained by Wood and the applicant towards the deceased, at the time of the killing, were not, in his opinion, friendly.    He had never heard Wood say anything particular about deceased.    He

had a conversation with applicant in his, witness's, field, some six, eight or ten months prior to this trial. No one else was present. The subject of the conversation was the probability of deceased swearing lies on him, the applicant, and others, in some cases then pending against them. In the course of that conversation applicant said that deceased ought to be killed or would be killed. It was the recollection of the witness that the applicant was left handed, but he did not know from which shoulder he was in the habit of firing guns. Witness lived within a half mile of the applicant, and was on friendly terms with him.

J. E. Warren, recalled by the State, testified that the defendant Wood and E. Hylton told him that both witness's and the deceased's names were marked as State witnesses on indictments against them for cattle stealing. Witness had testified before the grand jury with reference to theft of cattle by Wood and E. and W. K. Hylton. It was to these cases that the two parties named referred. E. Hylton, on the occasion referred to, came to witness at the Fritz corner, from the direction of the court-house, and told witness that an indictment had been returned against him for theft of cattle, and that witness and Ben, the deceased, were marked as witnesses, and asked witness: "Where did you ever know me stealing cattle?" The deceased was a witness before the grand jury which found those indictments.

It was agreed by counsel that, at the time of the killing, indictments were pending in the district court of Runnels county against the applicant and others for conspiracy to cut the wire fences of T. L. Odom & Co. or The Odom Land and Cattle Company, and that the deceased was a State witness in those cases.

J. C. Mathews was the next witness for the State. He verified the correctness of a plat of the scene of the shooting, drawn by him, but assuming the correctness of the reported positions of Odom, the deceased, and the stove in the office of the Central Hotel, when the fatal shot was fired. The diagram omits a few small buildings between the two hotels, but is otherwise correct. An alley runs between the restaurant and the Palace Hotel. The fence which forms one line of that alley, running back from the northwest corner of the Palace Hotel, is about three and a half feet high, except at one panel, which is entirely down. That opening was about three feet wide. Witness saw no mesquite trees within a few feet of that opening when he examined it. He did not observe any mesquite stumps between the two hotels. A wagon could pass into that alley until it reached the fence, and could proceed no further

because of the narrowness of the opening. Witness could not understand why a man would ride through that alley at night, from one hotel to the other, when just west of it there was a good open pass-way, unless he had a well defined motive in doing so. The alley between the livery-stable and the Central Hotel was between sixteen and eighteen feet wide. Witness noticed, on the morning after the killing, a wagon-bed leaning up against the stable, and, if his recollection is not at fault, a water wagon and an old hack standing in the alley west of the stable. He saw nothing of a pile of wood in the alley on the north side of the dining-room. West from where the water wagon stood the alley was open for the passage of wagons. The alley-way west is somewhat more convenient for travel than the pass-way by the restaurant. Witness did not consider the opening back of the Central Hotel a public pass-way. A path traversed it, but witness thought it was made by persons going to and from privies located along it. Witness was one of the prosecuting counsel in this case.

J. H. Beall was next recalled by the State. Describing the location of his house with reference to other buildings in the town, he testified that his house was situated between four and five hundred yards, between east and southeast of the Central Hotel. It stood on the south side of the railroad, some three hundred yards nearly east of Bradley's opera house. A person going direct from the Central Hotel to witness's house would pass the opera house at a distance of about thirty yards. The witness left his home on the night of the tragedy, between fifteen and thirty minutes past 7 o'clock, going to the opera house, where he remained until about ten minutes before 11 o'clock, when he went home, accompanied by Mr. O. B. Seitz and Mr. Wise, the band master. On his arrival at home he found he had visitors in the persons of Mr. Seitz's family, the applicant and Bud Wood. The plank fence about the premises of the witness passed his gate at a distance of three or four feet. The applicant, when the witness reached home, was standing inside of the yard, to the right of the gate and near one of the gallery posts. Witness could not remember whether Wood was inside of the house when he arrived or went in afterwards. Witness first saw Wood in the south room of his residence, which room led out to the gallery. Of the three remaining rooms of the house, the witness's wife's room stood north of the south room described, and in passing from his wife's room to the gallery, it was necessary to pass through the south room. Witness could not now remember whether or not there was a light in the south room when he got home on that night.

Witness did not see Wood until he, witness, had been in the house at least three minutes. Applicant followed witness, Seitz and Wise into the house. After witness kindled a fire in the south room, some general conversation ensued between the parties, the applicant remarking first that he and Wood had been at the house some time, talking to the women, and waiting for the witness. Witness had no recollection of any special discussion of the tax question, though he thought that during the evening the applicant asked how the people, in view of the hard times, were going to be able to pay their taxes. Something was said by the defendant about pistol cases in which they were witnesses against each other. The applicant made some remark about changing a road running across the divide, and about trouble he had had working the road. Witness could remember no more of their conversation in the house. As they started to leave, witness attended them to the gallery and apologized for his inability to keep them over night, when one of them replied that it made no difference, and that they had not come to stay over night, but to talk awhile, as nothing was going on in town. They then said something about going by Jim Warren's, and spoke inquiringly of shooting in town — whether or not witness had heard any — and said something about "centre-shot" or "centre-shooting." Some further remarks about the prevailing cold wind and the road were made, and applicant spoke of Ben Warren in the manner detailed by witness when first on the stand.

The witness did not notice particularly which way the parties went on leaving his house, but it was his impression that they went towards town. Witness could not say that either of the parties had a gun at his house on that night. He did not remember seeing a gun in the hands of either. He, however, did see a Winchester rifle at his house that night while the parties were there. The gun was not there on the next morning. Witness had lived in Sweetwater since May, 1882, since when he had known the applicant and Bud Wood. If either of them ever passed a night at witness's house, witness could not remember it. Applicant had eaten two or three meals there, but Wood had never been at witness's table. No intimacy existed between witness and the defendants, though, as acquaintances, their relations had always been friendly. If visiting or social relations existed between the families of the witness and those of the defendants, witness did not know it. Witness did not know where Jim Warren lived, and did not know to what place they referred when they spoke of going to Jim Warren's.

The witness saw the applicant and Wood in Sweetwater on the

day of the homicide, and saw both of them in the court-house on the next day. The witness observed nothing unusual in their deportment or conduct while at his house on the night of the murder, but they both looked somewhat unnatural next morning. Witness did not hear of the murder until about half-past 9 o'clock on the morning after it occurred. The witness was the assessor of taxes for Nolan county. He had no special contract with the collector to receive and receipt for taxes for him, but frequently did so at the request of the collector. These parties said nothing to witness about taxes on the day before the killing, though the applicant was in his office on that day. The two defendants usually came to witness's office when in town. Witness had never received taxes at his house at night. Witness and the two defendants were good friends,—merely friends, and not intimates. Witness had invited them to his house a few times, but never, to his recollection, to stay over night.

J. P. Wood was the next witness for the State. He testified that he was in Sweetwater for a short time on the evening of the murder. He passed that night at a house some four hundred yards south of the depot, which house was then occupied by Wilson Hunt and his family. Jim Warren was at that house from early in the night until some time between 10 and 12 o'clock, when he went to town in answer to a message brought him from Sheriff Bardwell by Bud Wood that his brother had been killed, and that his serv ices were needed. The witness had seen Bud Wood just before night, in Sweetwater, and spoke to him about taking some grain to some horses for him. Bud Wood declined on the plea that he was sick. His health had been bad for several days. When he came to Hunt's house that night after Jim Warren, he was coughing, and said that his health was bad. Hard feeling had existed between Bud Wood and deceased for some time, Bud insisting that deceased had falsely accused him of wrong. The applicant had never said anything to witness about his relations with deceased, and witness knew nothing personally about them.

C. H. Boyett, the father of the applicant, was the next witness for the State. He testified that he spent the fatal night at the house of F. G. Thurmond, in Sweetwater, going to that house from town between 9 and 10 o'clock, and retiring between 11 and 12. He remained at Thurmond's until 9 o'clock next morning. Witness heard the report of a gun or pistol on the night of the murder, while he was at Thurmond's house, and was told of the murder next morning while at the breakfast table. Witness and the appli-

cant left town, on the fatal night, at the same time, passing out of Johnson's saloon together at a little past 9 o'clock. On stepping out of the saloon, applicant asked witness where he was going to sleep. Witness replied that he was going to Thurmond's, where he had left his wife, and asked him where he expected to sleep. He replied that he would stay either at Beall's or Eidson's. Witness and applicant then parted on the street, a little to the right of Johnson's saloon, witness going up the street, and applicant, in company with Bud Wood, going across the street towards the shoe shop, which was in the direction of Beall's. A road by this shoe shop, and passing Beall's, led in the direction of Bradley's opera house. Witness last saw applicant that night near the shoe shop, from which point he did not know where applicant and Wood went. Witness had often seen applicant handle and discharge guns, but could not say from which shoulder he habitually shot, though he thought from the right shoulder. Applicant was left handed except in the use of the hoe and ax. The feeling which existed between the applicant and the deceased, and Bud Wood and the deceased, was not good. The origin of the ill feeling was malicious prosecutions instituted against the two defendants by the deceased, to do which he, the deceased, swore to lies, as the defendants were abundantly able to prove.

W. S. Lester testified, for the State, that he was reclining on a lounge in the office of the hotel when the fatal shot was fired. He was the first to reach the deceased after he was shot, and, at the suggestion of Colonel Odom, caught him to prevent his falling from the chair in which he was sitting. Deceased breathed two or three times while being moved, and then died. Colonel Odom, Dabney, Powell and a man known as the "Prairie Dog Poisoner," were in the room when the shot was fired. Mr. Lormey was the first person to come into the room after the shooting. Witness saw no one outside, nor did he hear any noise indicating the presence of any one.

Fred Beall was the next witness for the State. He testified that he, together with Henry Williams, Charles Day, R. B. Foster, Mc Boyett, F. Dismuth, and, he thought, Riley Hylton, were in Johnson's saloon when the fatal shot was fired. A few minutes after the shot was fired Mr. Powell ran into the saloon much excited, and said that a man had been killed at the Central Hotel. Witness went to the hotel. Ed Lormey was the first man he met on arriving there, and he told witness that he saw a man at the corner of the hotel with a pistol in his hand. In the evening, before

the killing took place, witness saw the applicant in possession of a nickel-plated pistol, which he put behind the bar in Bennett's saloon. He remarked that he had been having the pistol repaired.

J. E. Warren was again placed on the stand by the State, when he testified that the first he heard of his brother's death was when Bud Wood came to Wilson Hunt's house and called him up, telling him of the killing. He asked Wood how it happened. Wood replied that he knew nothing about it, that he was at Beall's house when it happened, and that the news was brought to Beall's house by some one after the band at the opera house broke up. Witness left Bud Wood at Hunt's house, undressing to go to bed. Witness and his brother, the deceased, were on perfectly friendly terms. Hard feelings existed between deceased on one side, and Riley Hylton, Bud Wood and Mc and Neil Boyett on the other.

O. B. Seitz testified, for the State, that he was in Dulaney's store when the shot was fired at the Central Hotel. He left about ten minutes later, going to Bradley's opera house. When the band broke up, about 10 o'clock, witness went to Beall's house, where he had left his wife, in company with Beall and Wise. As they went into the house they met two men coming out, who, Beall said, were Neil Boyett and Bud Wood. One of them took up a gun, a Winchester rifle the witness thought, which stood against the fence, and took it in the house. Witness passed into the north room of the house, leaving Beall, Wise, the applicant and Wood together in the south room. These parties remained in subdued conversation some twenty minutes, when Boyett and Wood left. Witness did not hear of the murder until he reached town on the next morning.

H. G. Bardwell, recalled, testified that he saw the applicant and Bud Wood eating supper in a restaurant, about 11 o'clock on the night of the murder. Wood asked witness how Warren was shot. Witness described the fatal wound, and told him that he was hunting some one to sit up with the corpse. Wood replied that he was unwell, but would sit up if witness could get no one else. He then told witness that Jim Warren was in town, and witness asked if he would find Jim. He agreed, and presumably did, as Jim came to the body afterwards.

J. A. Durham, recalled, testified that he was in the back part of Dulaney's store when the fatal shot was fired. He saw the applicant, Mc Boyett and Bud Wood in Bennett's saloon between fifteen and thirty minutes before the shooting. Having shaken dice with them for drinks, witness left them in front of the saloon and went to Dulaney's store to go to bed. The shot was fired not long after

witness arrived at the store. Before the witness left the saloon he heard the applicant call for Mc Boyett's overcoat, saying that he was going with Bud Wood to bed and might need it. Some one of the party asked Mc Boyett where he was going to sleep, and he replied that he did not know.

Mrs. H. Beall, wife of J. H. Beall, testified, for the State, that, on the night of the killing, the applicant and Bud Wood came to her house and called. Witness went to the door, and they asked if Mr. Beall was at home. Witness replied that he was not, and asked their names three times before one of them replied "Boyett." They said they wanted to stay all night. Witness replied that she had company and could not accommodate them with sleeping quarters. They then went into the house, saying they wanted to see Mr. Beall about taxes, and stayed until Beall arrived with Seitz and Wise, about an hour later. As they stepped into the house, Boyett said to witness: "Please don't say anything about our coming down here." The two, and applicant particularly, appeared to have been drinking. Applicant appeared much excited; Wood was calm, but very pale. They said nothing about a difficulty or killing in town. They engaged in a desultory general conversation, but would frequently whisper to each other in a tone of voice witness could not overhear. One of these parties stood a short gun up against the fence as he came into the yard. They remained about twenty minutes after the arrival of Mr. Beall, Seitz and Wise. Mrs. O. B. Seitz, who was present, corroborated Mrs. Beall circumstantially, and added that the applicant, while at the house, remarked to Wood that the Odom and other cases would come up for trial next day, and he winked and smiled.

James Bennett, recalled by the State, testified that Mc Boyett and Riley Hylton brought each a Winchester rifle to his saloon on the morning of the killing, and put them behind the pickets in the saloon. Witness did not know whether or not they had been removed.

M. K. McCausland, bar-keeper at Bennett's saloon, testified, for the State, that J. S. Moore, the applicant and Mc Boyett, a barber, and some others, were in the saloon a short time before the fatal shot was fired. Applicant and Mc Boyett and Riley Hylton were at the saloon when the witness locked up to go home. Mc Boyett went home with and slept with the witness. Witness did not know where applicant and Riley Hylton slept.

Bart Maroney, the proprietor of a restaurant, testified, for the State, that he, J. S. Moore, McCausland, and one Charley were the

only parties in Bennett's saloon when the fatal shot was fired. Witness went from the saloon to the Central Hotel shortly after the shot was fired, and about an hour later he returned to his restaurant and prepared supper for Bud Wood and the applicant. When the two men came into the restaurant they took positions near the stove. Witness told them that a man had been killed at the Central Hotel. Both looked and expressed surprise, and asked who the man killed was. Charley, who was an employee of the witness, answered that it was the man who had killed the cow, and was that day tried. Applicant and Wood then asked: "Is it Ben Warren?" Thenceforward while eating they talked in a low tone, evidently much interested in their conversation, but witness could not overhear it. A tall, slender man who had been with applicant and Wood in the evening was at that time in bed in the witness's house. He got up, talked with Wood and applicant in a low tone, while the two latter were at supper, and went out with them when they left. Witness saw nothing more of either of the three men that night. During that evening he saw the tall man and applicant together, each having a shot-gun.

P. G. Bradley testified, for the State, that he occupied a house in the rear of Bennett's saloon. Late on the evening of the killing he saw two men in the rear of Bennett's saloon, facing each other, in close conversation. Each had a gun. One wore an overcoat. This was about dusk; light enough for witness to see the guns, but too dark for him to recognize the men.

W. M. McDonald testified, for the State, that he left the Central Hotel a little after 9 o'clock, to go to Bradley's opera house and go to bed. He went by Bennett's saloon, where he found the applicant, Mc Boyett and Bud Wood. Witness asked where they were going to sleep. Mc Boyett said that he did not know. Witness told him to come to the opera house, and if Akin, Clarke and Sayers had left their blankets accessible, he, witness, could accommodate him with quarters for the night. Mc Boyett replied that he would go to Johnson's saloon, get Riley Hylton and go to the opera house. Bud Wood and applicant said they were going to sleep at a private house. The two latter left, going out of the saloon together. They left the saloon before Mc Boyett did. Witness went to the opera house, but Mc Boyett and Riley Hylton failed to appear. Mc Boyett came to the opera house next morning before witness got up and told him of the killing of Ben Warren. From the best information accessible to witness, he thought the shooting must have occurred about twenty or thirty minutes after he left the hotel. Witness

left the saloon, going to the opera house, some five or ten minutes after applicant and Bud Wood left the saloon, which was about twenty minutes before the shooting. Deceased was understood to be a witness against the Boyett boys, Bud Wood and Riley Hylton, in some fence-cutting cases, and it was generally understood that hard feeling existed between them. From witness's knowledge of the feeling between the parties, he would, at no time, have been surprised to hear of the killing of Ben Warren. Witness saw Riley Hylton and the Boyetts when they came into town before the killing. The party had two Winchester rifles.

W. R. Hylton testified that he and the applicant slept together at the house of J. F. Eidson on the night of the murder, having retired about 11 o'clock. Witness, applicant, Mc Boyett and Bud Moore ate supper together at the restaurant about dark. From the restaurant they went in company to Johnson's saloon, where they remained together about an hour. Witness then left Johnson's alone, and went to Bennett's saloon. He saw McCausland, Moore, "Charley," and others whom he did not know, at Bennett's saloon. After some time witness went back to Johnson's saloon and found the other parties — the two Boyetts and Wood — still there. In about thirty minutes, witness and Mc Boyett left Johnson's saloon together and went to Bennett's saloon. Witness did not know whether applicant and Wood were then in Johnson's saloon or not. He next saw applicant and Wood in the restaurant. Witness did not know how long he and Mc Boyett remained at Bennett's saloon, though they spent some time there, and returned to Johnson's saloon, where they were when the fatal shot was fired. Witness did not hear the shot, but was told by a man who ran hurriedly into the saloon that a man had been killed at the Central Hotel. Mc Boyett went to the Central Hotel, and on his return told witness that the man killed was Ben Warren. Mc Boyett and witness then went to Bennett's saloon, where they found McCausland and Moore. Applicant and Bud Wood were not there. Witness remained at the saloon but a few minutes, and then, with Moore, went to the hotel and saw Warren's dead body. From the hotel witness and Moore went back to Bennett's saloon, where they found Mc Boyett, McCausland, "Charley" and an aged stranger. Witness remained at Bennett's saloon until he went to Eidson's to go to bed. Before he left the saloon, applicant and Bud Wood came in together, and the three went together to the restaurant, and were in the restaurant when Bardwell came in and asked Wood to go to Hunt's for Jim Warren. Applicant and Wood were eating, during which time witness lay down on a pallet. While

Wood was gone to Hunt's, witness and applicant went to Eidson's to sleep. Going out of the restaurant applicant took up his gun. Witness did not know when he left the restaurant. Upon reflection, the witness thought he was in bed when applicant and Wood came into the restaurant and ordered supper. This was between 10 and 11 o'clock.

McD. Boyett testified that he, Riley Hylton, Bud Wood and applicant ate supper together at the restaurant, on the night of the killing. After finishing supper, the four went to Bennett's saloon, where they remained about thirty minutes. Riley Hylton and witness then went to Bradley's, fed their horses, and thence returned to Bennett's saloon, where they found applicant and Wood. Remaining there about fifteen minutes, the four went to Johnson's saloon, where they remained together about fifteen minutes, when witness, applicant and Wood went to Bennett's, leaving Hylton at Johnson's saloon. After a time applicant and Wood went off, saying they were going to bed, and witness went back to Johnson's saloon, and was there when a man came in and reported the killing of a man at the Central Hotel. Witness went with the crowd from Johnson's saloon to the hotel, and ascertained that the man killed was Ben Warren. Witness then went back to Johnson's saloon, where he remained some fifteen minutes; thence to Bennett's saloon, where he remained until he and McCausland went to McCausland's quarters and went to bed. Neither witness, applicant, Riley Hylton or Bud Wood entertained kindly feelings towards the deceased, because the latter had sworn lies on them. Witness could not say that he had ever heard applicant, Wood or Hylton utter threats against Ben Warren.

Wilson Hunt, recalled by the State, testified that Bud Wood passed the nights of February 9th and 10th, the latter being the night of the murder, at his house. He came to the house about 12 o'clock on the night of the killing, and told Jim Warren of the killing of the deceased, and proffered, two or three times, any assistance he could render. When Wood first came to witness's house he left a Winchester rifle, which was still there, and had been ever since it was first brought. There was, at the witness's house, a bright, long forty-four or forty-five caliber Colt's pistol. Witness did not know who owned it or who brought it to the house, or when it was left there. He found it on a small trunk under the bed. He had no idea who owns it.

Fred Beall, a deputy sheriff, being recalled, reiterated his testimony when previously on the stand. The pistol the applicant had

in his hand on the occasion referred to by witness on his examination in chief was a Colt's revolver of forty-five caliber. It was not loaded. When the witnesses before the coroner's jury were placed under the rule next day, witness took a different pistol from the person of the applicant. Applicant was never molested for carrying a pistol, because he was authorized to do so as a constable of Nolan county.

Joseph Boone was the next witness. He testified that he lived between two and three hundred yards northwest from the Central Hotel. Witness heard the report when the gun was fired, and saw the flash. He was then standing at a point that brought the flash nearly on a line with him and the hotel, though he could not locate the exact point from which the gun was fired. Witness, on hearing the report and seeing the flash of the gun, walked from where he stood to the corner of Bardwell's store; thence down the street towards the depot and into the hotel, where he found the deceased's body. Witness left his house that night at thirty minutes past 9 exactly, and he was about five minutes walking thence to the point from which he saw the flash of the gun and heard the report. Witness's watch was with railroad time, varying, perhaps, a very few minutes.

Cross-examined, the witness stated that when he saw the flash he stood somewhere near about the northeast corner of Vaughan's shop. He thought that a line drawn from there to the northwest corner of the main Central Hotel building would leave the flash as he saw it a little to the left. Witness stood between twenty and forty feet from the northeast corner of Lee's livery-stable, and near the south side of the street. When the witness reached the depot, if he recollects correctly, he compared his watch with the clock there, and found them together. When he boarded the train going east a little later, he found his watch five minutes faster than the conductor's time. Witness did not know whether the flash he saw was beyond the hotel from where he stood or not, but did not think that, from where he stood, he could have seen the flash of a pistol fired beyond the hotel. Witness left Sweetwater that night on the regular east-bound passenger train, which was late. He reached the depot about ten minutes before 10 o'clock. The train pulled in not far, either way, from 11 o'clock. The distance from where witness stood when he saw the flash to the northeast corner of the Central Hotel was about one hundred and sixty or one hundred and eighty feet. Witness thought that, perhaps, the northeast corner of that hotel could be seen from where he stood in the day-time. This wit-

ness was subsequently recalled at his own request, and stated that, having experimented, he found that the northwest corner of the hotel could not be seen, even in day-time, from where he stood when he saw the flash. From where he stood, the one window in the lower story, and the two windows in the upper story, on the north side and near the northwest corner of the hotel, can be seen in the day-time.

Mrs. O. B. Seitz, recalled, testified that applicant and Wood came to Beall's house, where she was, on the night of the murder, between half-past 9 and 10 o'clock. She saw the clock at 9 o'clock, before they came, and based her estimate of the time upon the amount of work performed by a little girl under the direction of Mrs. Beall, and her knowledge of what time it should take such a girl to perform such work. Witness declined to say positively that the parties reached Beall's earlier or later than forty minutes past 9. At this point the State closed.

Mrs. H. Otey testified, for the applicant, that she was at home on the night that Ben Warren was killed. At exactly ten minutes before 10 o'clock she started from the stove across her room to wind up her clock, and the shot was fired as she was crossing the room. She did not know how her clock compared with railroad time.

Mrs. O. B. Seitz, called for the applicant, reiterated her former statement that the applicant and Bud Wood arrived at Beall's house between half-past 9 and 10 o'clock on the fatal night. She did not see the clock after 9 o'clock, but estimated the time that elapsed between 9 o'clock and the arrival of the two men, by what was accomplished by a little girl at work for Mrs. Beall.

Wilson Hunt was next introduced by the applicant. He testified that when Bud Wood came to his house, about midnight on the night of the assassination, he said to Jim Warren: "Ben is killed." He said that he met Bardwell in town, who told him that Ben was killed, and asked him to go for Jim Warren. Wood said nothing else about how he heard of the killing. Jim Warren did not ask him how it happened. He did not tell Jim Warren that he was at Beall's when Ben was killed. He did not say that when the band broke up, some one from the opera house brought the news. Witness had told everything that passed between the parties that night. He heard all of the conversation between Wood and Jim Warren. The killing was not discussed by Bud Wood and old man Wood on that night, after Jim Warren left. Witness slept near enough to both of them to have touched them on either side with his hands, and knew that he could have heard any conversation between them.

Several witnesses who were called to qualify as to the financial *status* of applicant testified that he and his connection were reputed to be poor men. One or two witnesses questioned his ability to furnish bond in the sum of $1,000.

The applicant's sworn statement, as reduced to writing on the coroner's inquest, was next put in evidence. It reads as follows:

"I eat supper at the restaurant about dark, with my brother Mc, Riley Hylton, Bud Wood and others, I don't remember who. The first place we went after supper was the saloon. I don't remember whether the boys above named went with me or not. I do not remember which saloon I went to first. During the early part of the night we were scattered; sometimes at one saloon, Bennett's, and sometimes at the other saloon, Johnson's — first one place and then another — sometimes all together. I do not remember how long it was after I saw Jim Durham at the saloon before the shot was fired. When the shot was fired I expect I was on my way to Mr. Beall's. If I heard any shot I do not have any recollection of it. It was not late when I left town to go to Mr. Beall's. I expect we stayed two hours at Mr. Beall's. Bud Wood and myself started from Bennett's saloon to Mr. Beall's. We went over to the depot; over by the opera house — or some way, I do not know exactly how.

"Mr. Beall was not at home when we got there. I had my Winchester rifle, forty-four caliber, with me. Wood did not have a gun. After Mr. Beall got home we stayed at his house, I reckon, an hour. Beall, I suppose, had not heard of the shooting when he got home. There was nothing said of it. We came from Beall's back to the restaurant. I brought my gun back to the restaurant and kept it with me, and afterwards carried it up to Mr. Eidson's. When I came to the restaurant Riley Hylton was in bed. Riley got up, and Mr. Bardwell came in and wanted some one to sit up with the corpse. Riley and I went up to Eidson's and went to bed. Bud went down to Hunt's to notify Jim Warren. I did not say to Mrs. Beall not to tell that I and Wood had been at Beall's. Nothing was said at Beall's about Odom's case coming up to-day. There was not a good feeling existing between myself, Mc Boyett, Riley Hylton, Dow Hylton, Bud Wood and Ben Warren, because Warren had been paid to testify against us. I have heard a good many people make threats against Ben Warren. I have heard Peter Thompson, George Sutton, William Yardley, and have heard lots of others threaten Ben Warren, but I decline to give any other names. These parties said they would kill Ben Warren if they ever got a chance. I don't

think I ever heard Bud Wood or Riley Hylton make any threats against Ben Warren."

Question. "Did you ever hear Dow Hylton make any threats?"

Answer. "I have told you I would not give any more names."

"It was Bud Wood's pistol that I said I had repaired; and he has it, or ought to, for I gave it to him in the early part of last night. It was only a 'stiff' I was giving Beall when I told him I was having it repaired. I got the pistol at Eidson's office. Do not know who left it there." Applicant closed.

C. F. Powell was next introduced by the State. He testified that he was a resident of the city of Austin, Texas. He arrived in Sweetwater on Sunday evening previous to the Tuesday night of the assassination of the deceased. Witness was sitting between the windows in the hotel office when the fatal shot was fired. The deceased was then directly behind the stove, facing witness. When witness first noticed the deceased after the shot was fired, he was sitting in the chair with his head thrown back. The ball entered at the point of the deceased's left cheek. Witness did not examine to see where it passed out. Colonel Odom, Mr. Lester, Mr. Dabney and a man who was selling prairie-dog poison were in the room at the time of the shooting. Witness was the first man to pass from the room to the street. He put on his overcoat as he went. Witness went direct to Johnson's saloon. He walked very fast, and saw no one on the street. Walking rapidly he would hardly have noticed any one who might have been on the street. He reached Johnson's saloon within two minutes after he left the hotel. Some eight or ten men were then in the saloon.

County Judge G. W. Germany was next introduced. He testified that, during the February term, 1885, of the Nolan county court, the case of *The State of Texas* v. *Ben Warren*, for shooting J. M. Burton's cow, was tried, the result being a hung jury. W. R. Hylton and Bud Wood were State witnesses. Witness saw Wood on the evening before the shooting. He saw the applicant in the county court room next morning about 9 o'clock. He was very pale in the face and wore a very frightened look.

James Bennett, recalled for the State, testified that he went home through the alley north of the Central Hotel. He passed through about three quarters of an hour before the fatal shot was fired. He saw no one in the alley. When he got near the blacksmith shop near the end of the alley he heard a noise in or about the alley, which he thought at the time was made either by a man or horse,

his first impression being that the noise was made by a horse. He stooped and looked — not carefully — but saw nothing. It was then dark.

*J. F. Eidson* and *Cowan & Posey*, for the applicant.

*J. H. Burts*, Assistant Attorney-General, and *J. B. Scarborough*, County Attorney, for the State.

Hurt, Judge. The appellant was indicted by the grand jury of Nolan county for the murder of Ben Warren, in Sweetwater, on February 10, 1885. He was arrested on the 26th day of June, 1885, and on the same day sued out a writ of *habeas corpus* for bail, which, upon the hearing on the writ, was refused; from which judgment the appellant prosecutes this appeal.

"All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident." (Bill of Rights, section 11.)

That the party or parties killing Ben Warren were guilty of murder of the first degree, and hence guilty of a capital offense, there cannot be the slightest doubt. The only question arising in this case is whether the proof *is evident* that appellant, either alone or with others, *killed* Ben Warren?

What are we to understand to be the meaning of the word "*evident?*" Mr. Webster defines it thus: "Manifest, plain, clear, obvious, apparent, notorious." "Evidently:" "In an evident manner, clearly, obviously, plainly." Now, unless it plainly, clearly, obviously appear by the proof that appellant alone, or with others, killed Ben Warren, the appellant is by virtue of the Constitution entitled to bail.

We are of the opinion that the facts, as presented by the record, do not show with reasonable certainty that the appellant alone, or with others, killed the deceased. It is not thought prudent in cases of this character to comment upon the facts for the purpose of supporting the correctness of the conclusions reached by the court, in granting or refusing bail, because a discussion of the facts might improperly influence the jury on the final trial of the cause below.

For the error in the court in refusing to admit appellant to bail, the judgment is reversed, and it is ordered and adjudged that he be admitted to bail in the sum of $7,000.

*Ordered accordingly.*

[Opinion delivered October 14, 1885.]